**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 29 2013, 9:05 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**WILLIAM S. FRANKEL, IV**
**DAVID P. FRIEDRICH**
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD C. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JEFFREY A. BOOTH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 84A01-1203-CR-118 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VIGO SUPERIOR COURT
The Honorable David R. Bolk, Judge
Cause No. 84D03-1103-FB-782

**January 29, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

Jeffrey A. Booth ("Booth") appeals his conviction, following a jury trial, for Class B felony dealing in methamphetamine[1] and Class D felony possession of methamphetamine.[2]

We affirm.

## ISSUE

Whether sufficient evidence supports Booth's convictions.

## FACTS

On March 9, 2011, around 12:30 a.m., Terre Haute Police Officer Gregory Mossbarger ("Officer Mossbarger") and Officer John Perillo ("Officer Perillo") were dispatched to 1425 South 6th Street in Terre Haute to investigate a possible methamphetamine lab. After the officers approached the garage from the alley and smelled an odor that they knew was associated with a methamphetamine lab, they called for further assistance.

Shortly thereafter, Sergeant Harold Seifers ("Sergeant Seifers") arrived at the scene. As he approached from the alley, Sergeant Seifers also detected the methamphetamine-related odor, which got stronger as he neared the garage. As the officers stood outside the garage, they heard music and people talking inside the garage and saw light from the cracks around the garage door.

---

[1] Ind. Code § 35-48-4-1.1(a).

[2] I.C. § 35-48-4-6.1.

The side garage door then opened, releasing a "real strong" odor from the garage, and Booth walked out with a cigarette and a lighter in his hand. (Tr. 235). When Booth saw the officers, he appeared "real surprised" and then "shut the door behind him real fast." (Tr. 226). Sergeant Seifers grabbed Booth, stopped him from lighting his cigarette and asked him why he was there and if anyone else was inside the garage. Booth responded that he was there working on a car and that there was someone else in there. Sergeant Seifers had Booth knock on the door, and Robert Fennell ("Fennell") opened the door and walked out. The officers then took Booth and Fennell into custody.

Sergeant Seifers and Officer Perillo then went inside the garage, where the "very, very, very strong" odor from inside made their eyes burn and required them to hold their breath. (Tr. 242). The officers saw items associated with methamphetamine manufacturing and, fearing an explosion, opened the main garage door to air out the space. Sergeant Seifers asked Booth and Fennell who had the key to the garage, and Booth responded that he did. Sergeant Seifers retrieved the key from Booth's pocket, opened the garage door, and called the Drug Task Force to report the methamphetamine lab.

Detective Denzil Lewis ("Detective Lewis") and Detective Jason Parker ("Detective Parker") of the Drug Task Force then arrived at the scene and briefly walked through the garage. Detective Parker then called Indiana State Police Trooper Jason Kempf ("Trooper Kempf") to process the methamphetamine lab because "it was a lot larger than [the detectives] could handle." (Tr. 341).

3

Trooper Kempf arrived around 3:00 a.m. to process the methamphetamine lab in the garage. When he arrived, he could "still smell the odor of anhydrous ammonia" used in the methamphetamine manufacturing process. (Tr. 259). There was a car in the garage, but there were no fluids on the floor to indicate that someone had worked on a car. Instead, Trooper Kempf observed items used in the various stages of methamphetamine production, including the presence of: (1) anhydrous ammonia that was in a Coleman fuel container; (2) "pill dough" or ground up pseudoephedrine pills that were soaking in the anhydrous ammonia to extract the pseudoephedrine to convert to methamphetamine, (Tr. 267); (3) a wooden spoon or "stir stick" to stir the pill dough, (Tr. 307); (4) a Mountain Dew bottle with a tube sticking out of it that was used as a hydrochloric ("HCL") gas generator and that was continuing to produce HCL gas; (5) salt and Liquid Fire to use in the HCL generator; (6) a pitcher containing methamphetamine and "waiting for the stage of being gassed off" in the HCL generator, (Tr. 275); and (7) a pitcher with a coffee filter containing a finished methamphetamine product. Trooper Kempf also observed a Crock pot in the garage.

Detective Lewis obtained a written consent to search the garage from Booth. Detective Lewis also interviewed Booth at the scene and made an audio recording of the interview. Booth told Detective Lewis that he did not live there but that he had gotten the key to the garage from Jeremy Gibson ("Gibson") so he could work on Gibson's car. Booth said that Gibson wanted him to remove the old radiator and old sway bar arm and replace them with a new radiator and new sway bar arm. Booth told Detective Lewis that he arrived at the garage at 7:30 p.m. and that Fennell arrived at 8:00 p.m. In response to

4

the detective's question of what Fennell did when he arrived, Booth responded that Fennell "put the pill trash in a pitcher[,]" (State's Ex. 1; Tr. 351); "poured some Coleman's on it and then put it in the Crock pot[,]" (State's Ex. 1; Tr. 353); turned on the Crock pot; and then left for about an hour. (State's Ex. 1; Tr. 351). Detective Lewis asked Booth if it smelled when Fennel did that, and Booth stated that it smelled like "[a]nhydrous." (State's Ex. 1; Tr. 352). When the detective asked Booth how the HCL generator got to the garage, Booth appeared confused by the term generator. Detective Lewis rephrased the question to ask about the device that was used with "[t]he drain cleaner and the salt . . . pour[ed] . . . in there" and that was used to "smoke the dope," and Booth responded, "Oh, um, that's, he usually has that in there under that bench." (State's Ex. 1; Tr. 354). Booth stated that upon Fennell's return to the garage, Fennell took the pitcher out of the Crock pot and then took another pitcher and "ran it through a filter." (State's Ex. 1; Tr. 355). When asked if Fennell "g[o]t any product, Booth indicated that it "looked like he did." (State's Ex. 1; Tr. 355). Finally, Booth admitted to Detective Lewis that he and Fennell had smoked some methamphetamine while they were in the garage but stated that the methamphetamine "was some that was already done." (State's Ex. 1; Tr. 356).

The State charged Booth with: Count 1, Class B felony dealing in methamphetamine (by manufacturing); Count 2, Class D felony possession of chemical reagents or precursors with intent to manufacture a controlled substance; and Count 3, Class D felony possession of methamphetamine.

5

On February 7-8, 2012, the trial court held a jury trial. With regard to the dealing charge, the State proceeded under the theory that Booth either manufactured the methamphetamine or aided Fennell in the manufacturing process. The State tendered, without objection from Booth, an instruction on accomplice liability for the dealing in methamphetamine charge. The trial court accepted the instruction and instructed the jury that it could find Booth guilty of dealing in methamphetamine if it found that he aided Fennell to commit the offense. The jury found Booth guilty of Count 1 and 3 but not guilty of Count 2. The trial court imposed a fourteen (14) year sentence for Booth's dealing conviction and a two (2) year sentence for his possession conviction. The trial court ordered that the sentences be served concurrently and executed at the Department of Correction.

## DECISION

Booth argues that the evidence was insufficient to support his convictions for: (a) dealing in methamphetamine; and (b) possession of methamphetamine.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

6

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (internal quotation marks and citations omitted) (emphasis in original).

A. <u>Dealing in Methamphetamine</u>

Booth first argues that the evidence was insufficient to support his conviction for dealing in methamphetamine. To convict Booth of dealing in methamphetamine as charged, the State was required to prove beyond a reasonable doubt that Booth "knowingly manufacture[d] methamphetamine." (App. 10). *See also* Ind. Code § 35–48–4–1.1(a) ("A person who . . . knowingly . . . manufactures . . . methamphetamine, pure or adulterated . . . commits dealing in methamphetamine, a Class B felony[.]"). "Manufacture" is defined as:

> the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container.

Ind. Code § 35-48-1-18(1).

Booth acknowledges that methamphetamine was manufactured in the garage and that he was in the garage but argues that the evidence was insufficient to show that he knowingly manufactured it because none of the officers saw him manufacture the methamphetamine. He contends that Fennell was the only person involved in manufacturing the methamphetamine and that he was merely present in the garage working on a car and had no involvement in the manufacturing process.

Here, the trial court instructed the jury, without objection from Booth, that he could be found guilty of dealing methamphetamine under a theory of accomplice liability. The accomplice liability statute provides that "[a] person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense . . . ." Ind. Code § 35–41–2–4. In determining whether a person aided another in the commission of a crime, we consider factors such as: (1) presence at the scene of the crime; (2) companionship with another at the scene of the crime; (3) failure to oppose commission of the crime; and (4) course of conduct before, during, and after occurrence of the crime. *Garland v. State*, 788 N.E.2d 425, 431 (Ind. 2003).

Here, the evidence reveals that, from 7:30 p.m. to around 12:30 a.m., Booth was present in the garage where methamphetamine was clearly being manufactured. When Booth walked out of the garage and saw police, he immediately shut the door behind him. Booth claimed to Detective Lewis that he was in the garage only to work on a car. While the evidence revealed that Booth's hands were dirty and there were tools and a car in the garage, officers testified that the tools were not lying about and there were no fluids on the garage floor. Instead, the evidence shows that Booth was aware that Fennell was engaged in the process of manufacturing methamphetamine. Indeed, Booth's interview with Detective Lewis reveals that he was aware of the stages of the manufacturing process. Furthermore, the evidence also reveals that Booth did not oppose the manufacturing of the methamphetamine. To be sure, from the evidence presented, the jury could have inferred that Booth assisted with the mixing of the pill dough. Booth claimed that Fennell put the "pill trash" in a Crock pot and then left the garage for one

8

hour. (State's Ex. 1; Tr. 351). However, police officers testified that, at that early stage of manufacturing, the pill dough has to be stirred or it will stick and that it cannot be left unattended. They also testified that the pill dough in the garage did not show signs of being unattended. Additionally, Booth admitted that he smoked methamphetamine with Fennell while he was in the garage.

Booth's argument that he was merely working on his car and was "in the wrong place at the wrong time" is nothing more than an invitation to reweigh the evidence, which we will not do. *See Drane*, 867 N.E.2d at 146. Because there was probative evidence from which the jury could have found Booth guilty beyond a reasonable doubt of Class B felony dealing in methamphetamine, we affirm his conviction.

B. Possession of Methamphetamine

Booth also argues that the evidence was insufficient to support his conviction for possession of methamphetamine. To convict Booth of possession of methamphetamine as charged, the State was required to prove beyond a reasonable doubt that Booth "knowingly possess[ed] methamphetamine." (App. 10). *See also* Ind. Code § 35–48–4-6.1(a) ("A person who, without a valid prescription . . . , knowingly . . . possesses methamphetamine (pure or adulterated) commits possession of methamphetamine, a Class D felony[.]").

Booth was not in actual possession of the methamphetamine found in the garage; thus, the State was required to prove that Booth had constructive possession of the methamphetamine. Evidence of constructive possession is sufficient where the State

proves that the defendant had intent and capability to maintain dominion and control over the contraband. *Hardister v. State*, 849 N.E.2d 563, 573 (Ind. 2006).

The intent element of constructive possession is shown if the State demonstrates the defendant's knowledge of the presence of the contraband. *Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999). A defendant's knowledge may be inferred from either the exclusive dominion and control over the premise containing the contraband or, if the control is non-exclusive, evidence of additional circumstances pointing to the defendant's knowledge of the presence of the contraband. *Id.* These additional circumstances may include: (1) incriminating statements by the defendant; (2) attempted flight or furtive gestures; (3) a drug manufacturing setting; (4) proximity of the defendant to the drugs; (5) drugs in plain view; and (6) location of the drugs in close proximity to items owned by the defendant. *Hardister*, 849 N.E.2d at 574. The capability element of constructive possession is met when the State shows that the defendant is able to reduce the controlled substance to the defendant's personal possession. *Goliday*, 708 N.E.2d at 6. For example, proof of a possessory interest in the premises where illegal drugs are found is sufficient to show capability to maintain dominion and control over the contraband. *Id.*

Here, Booth does not dispute that the garage was a drug manufacturing setting for manufacturing methamphetamine. Indeed, the evidence reveals that the garage had the very strong odor associated with the manufacturing of methamphetamine emanating from it. Additionally, the evidence indicates that the garage contained the various stages of methamphetamine manufacturing. Booth was present for five hours in the garage where methamphetamine was manufactured. He made a furtive gesture of trying to quickly

10

close the garage door when he saw the police standing outside the garage door. The evidence also reveals that the products used to make methamphetamine, as well as finished methamphetamine, were in plain view and in close proximity to Booth. Furthermore, Booth's statements to Detective Lewis were incriminating because they revealed that Booth was aware that methamphetamine was being manufactured and suggest that he was aware of the various steps or procedures for manufacturing methamphetamine. Booth also made incriminating statements by admitting that he had smoked methamphetamine while in the garage. Given the evidence presented, we conclude the State presented evidence of additional circumstances sufficient to prove that Booth had the intent to maintain dominion and control over the contraband.

The State also presented sufficient evidence on the capability element. Although Booth did not live at the house where the garage was located, he (and not Fennell) possessed the key to the garage. Additionally, given the close proximity of the drugs in the garage to Booth and his furtive gesture of quickly closing the garage door when he saw police, we conclude the State presented sufficient evidence to show that he was able to reduce the drugs to his personal possession. *See, e.g., Goliday*, 708 N.E.2d at 6 (evidence was sufficient to show that the defendant, who had a key to the trunk where the drugs were located, had the capability to maintain dominion and control over the drugs).

The evidence is sufficient to show that Booth had the intent and capability to maintain dominion and control over the methamphetamine. Because there was probative evidence from which the jury could have found Booth constructively possessed the

11

methamphetamine, we affirm his conviction for Class D felony possession of methamphetamine.

Affirmed.

ROBB, C.J., and MAY, J., concur.